Case number 16-1315 et al. David Saxe Productions, LLC et al. Petitioners v. National Labor Relations Board. Ms. Murphy Petros for Petitioners, Ms. Isbell for Respondent. Good morning. Good morning, Your Honors. And may it please the Court, Melissa Murphy Petros on behalf of the petitioners here. Petitioners challenged that part of the Board Majority's order, which found that the non-respondent petitioners, the non-renewal of Ann Carter's contract for the two shows in question, was unlawful under the Act and ordered that Carter be reinstated to her position. The only issue here presented is whether Carter's contract was not renewed because of her protected activity at the December 13, 2011 staff meeting, as the Board Majority found, or as the ALJ and the Board Dissenter found, whether her contract was not renewed due to her longstanding attitude and performance issues. So actually, the only issue is, is there substantial evidence to support the Board's determination. Is that correct? That is correct. That is the standard of review. And we submit that there is not substantial evidence to support the Board's decision. The Board, although it stated that it was accepting the credibility findings of the ALJ, in fact, rejected those findings by relying only on Mr. Saxe's testimony. The Board did not look to the testimony of the choreographer, the dance captains, the dancers, all of these other people whom the ALJ specifically found to be corrupt. And it was not credible in reaching its conclusion. It treated this case as if he were the only witness. You agree though that there can be evidence in the record that would support a contrary view and still there would be substantial evidence to support the Board. Do you not? I do. I still... So here, why couldn't the Board say, we credit all these people who were complaining, but look at what happened with Mr. Saxe, who's the decision maker. Well, the ALJ... The timing. I'm sorry. The timing and the change of explanation. And so it's all these cases about the problem of changes of explanation. The ALJ actually specifically addressed those issues with respect to Mr. Saxe's testimony. And those were credibility findings that we maintain the Board majority also rejected. Mr. Saxe did testify contrary... What credibility determination did the Board reject as to Mr. Saxe? The Board rejected the ALJ's finding that his initial testimonies, that number one, he decided not to renew her contract after the December 13 meeting. What I'm getting at, it was undisputed. He changed his position, correct? It was undisputed that, yes, yes. And the ALJ specifically discredited that of his testimony, which was not corroborated by anybody else. I thought, I'm trying to clarify, that the ALJ credited his first testimony and didn't credit his second testimony. That's correct. His initial testimony is that he did not decide to renew her contract until after the December 13 meeting, and that he relied on input from Mr. Martina and others in making that decision. And I read the Board to do something a little different, which is to say we're not going to give any credence to Saxe because his testimony had changed. That's correct. So the Board rejected all of the credibility findings which the ALJ made with respect to Mr. Saxe. She credited his initial testimony because it was corroborated by numerous other people, and she specifically discredited the second two pieces of testimony. And to discredit is a credibility finding. So let me be clear. I mean, the Seventh Circuit, like us, is bound by the Supreme Court's decisions, and the universal camera makes it perfectly clear that the Board can properly reject credibility determination. So that's why I just wanted to be clear. It wasn't disputed that Mr. Saxe changed his testimony about when he made the decision not to renew Mrs. Carter's contract, and I thought you had agreed. And the question was what inference to draw from that. And the ALJ drew one inference based on the corroborating testimony, and the Board drew another. That is correct. The Board's own derivative inference is implicitly based on a rejection of the ALJ's very extensive and detailed credibility findings with respect to all of the other witnesses. Mr. Martino, the choreographer, the two dance captains, three of the other dancers. All I'm getting at is everybody, it's almost undisputed in the record, isn't it undisputed in the record, that everybody wanted Mr. Saxe not to renew this dancer's contract, and he resisted. He said, let's give her another chance, let's extend her contract. All right? And the Board says, and then what happened? And then what happened is that, I guess this in a sense is a story of no good deed goes unpunished. Mr. Saxe did have her contract renewed in order to give her other opportunities. He finally then listened to his colleagues at the show. And if you recall, Mr. Martino, whom the ALJ specifically credited, testified that in November of 2011, there were auditions going on for additional and new dancers to the show, and Ms. Carter was one of the dancers who was to be replaced. So I'm back to my point that there can be substantial evidence in the record for two different views as to what is the appropriate inference to draw from Mr. Saxe's changed testimony about when he made the decision. I think the key here, as a general principle, yes. But I think the key here that makes this case very unique is that this case is all about credibility. There is no smoking gun document that indicates his motive. This is what I'm trying to get you to focus on. It's not credibility in the sense, did he say he decided to fire her in October or November? And then did he later say, or let's say it went around, December? I mean, he testified both ways. So those are undisputed. And it's undisputed that the dance supervisors did not want him to renew this lady's contract. So I'm not sure I know what the credibility issue is there. It's undisputed. The credibility issue here, again, this is a case, as I was saying, where there literally is no documentary evidence. All of the evidence before the ALJ was testimonial. The ALJ heard all of these people, was the only person to see them and to observe their testimony and their demeanor on the stand, and determined that based on her findings, that all of these people were credible, based on her specific findings with respect to Mr. Sachs' testimony, crediting that which was corroborated, specifically discrediting the other, that Ms. Carter's contract would not have been renewed, regardless of what happened at the December 13, 2011 meeting. So it was Sachs when he initially said, I didn't make the decision until later in December, but I was not going to renew her contract, regardless of what happened at that meeting, because of all the input I had received and all the issues we had had. The ALJ credits that testimony, as I understand. Correct me if I'm wrong. I'm trying to understand. And then Sachs later testifies, actually I made the decision even before that December meeting, and not to renew her contract, and the ALJ discredits that testimony. So the ALJ believes his initial testimony he was going to not renew, regardless. Which was corroborated by Martina, among others. Yes, by Martina and by Mr. Kelsey and Ms. Mitrea, the two dance captains, as well. And the ALJ and the board, even more than the ALJ, are a little suspicious of the conflicting testimony, and also the timing makes, I guess, a couple things. The timing makes it a bit suspicious for the board, that it occurs so quickly after the December meeting. And then secondly, the fact, as Judge Rogers said, that previously Sachs had given her second and third chance kind of thing, even despite similar complaints in the past. So those are two things the board relies on. They are two things the board relies on, and I'll note further, however... Well, again, in relying on those, the board majority specifically stated that the ALJ did not look at those factors, did not consider them in her right-line analysis, and that is just factually untrue. So is the proper remedy here, because I find this a very close case, I'll just put that on the table for both counsel. Is the proper remedy here, under your view, to send it back to the board? I know that's not your preferred remedy. Send it back to the board for the board to reconsider the case without making some of the mistakes of characterization that you have pointed out. You're right, that would not be my preferred remedy, of course, but that certainly would be a remedy that we would accept and would welcome. Because I see two things that are, and this is maybe a question for your opposing counsel, but two things the board says that seem a little less substantial, maybe incorrect. One is the thing, oh, because he kept her on before, he necessarily was doing something different. He would have kept her on here, but for the December meeting. That doesn't follow to me, and I know you've raised that. And the second thing is the way the board characterizes the ALJ's credibility findings, as you point out, does not seem to correspond to how high read the ALJ's actual credibility findings. So you could note those things and send it back to the board and tell them to reconsider. You certainly could, and you could also reinstate the ALJ's order as it was, of course. I understand, that's your preferred remedy. Yes, but you certainly could send it back for further consideration. I find that remedy, that's a tougher hill to climb, given what Judge Rogers is emphasizing, the standard of review. Although it is proper for us in looking at the board's opinion to make sure they characterized everything correctly and to check the logic. And there are some holes there, as I see it. It's a little bit harder to just flat out reverse it, I think. But not impossible, so that's one of the things we're all exploring here. Let me ask you, were you as surprised as I was when I read footnote one in the board's order? The board's established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all relevant evidence convinces us that they are incorrect. We have carefully examined the record and find no basis for reversing the findings. Yes, yes, the board has said that it's, that's boilerplate language that seems to appear in numerous decisions. But yes, they say they're. Do you think that's a Scrivener's error or what? I don't think it's a Scrivener's error. I do think it's a boilerplate phrase that I, is researching for this case that seems to show up quite a bit. They say that they did not, they say they accepted the ALJ's credibility findings, but saying something doesn't make it so. That's the point. When you read what they did. Keep going. I'm sorry, sir. When you read what they actually did, the only way to reach the conclusion that the majority came to, and dissenter Ms. Gamara I think pointed this out very eloquently, the only way to reach that conclusion is to not accept the credibility findings with respect to really all of the other witnesses, to just put them aside. And again, I would emphasize that even the finding that the ALJ made specifically discrediting some of Mr. Sachs' testimony is itself a credibility finding. What about the boards, just so I'm clear, and then I can take the other side of this argument when I'm discussing this with board counsel. The board says, in light of the judge's findings, that Sachs' decision not to renew her contract was only made after and shortly after Carter's protected activity, and Sachs' failure to explain why Carter's performance and attitude issues suddenly became a concern. That we find his proper reasons for her discharge were pretextual. So, I read that to mean that under right line, both the ALJ and the board agreed that her protected activity was a motivation, but it was the burden of the employer to demonstrate that it would have discontinued her contract anyway. And so the board is focusing on his failure to explain why all of a sudden he changed his mind. And there is record evidence, I think, as I'll mention to counsel, the board, that could explain it, but he never made, he never offered that explanation. He did offer the explanation. How did he explain why Carter's performance and attitude issues suddenly became a concern after that meeting? Let me just say, I just want to say, suddenly is the board's interpretation of what he did. And for months, he was being hit with all these people saying, get her off here, she's driving us crazy, she's a bad dancer. So what, to me, had extraordinary patience, but it's their characterization of suddenly that has no evidence. Yes, I do agree with Judge Henderson's characterization of the word suddenly.  When you read Mr. Sachs' testimony and the transcript as a whole, and this is at page A572 and page 25 of our opening brief, he was asked at trial, why did you not renew her contract? This goes to the very question. And he says the real simple answer is because Martina and the dance captains told me don't renew her on the new contract. I have a block quoted, so I won't read the whole thing. But he states very specifically that he is finally listening to them and acting upon their concerns. And he's given her enough opportunities. He's not obligated to allow her infinite opportunities to continue to improve her performance. And it's a subjective issue, to be sure. We're talking about live theater versus something that can perhaps be more specifically quantified. But he does answer the question that it was performance and attitude issues, that it was not what she had to say at the meeting. Other dancers spoke at the meeting, too, as well, including one, Ms. Boisheur, with whom apparently the discussion was quite heated. And she was not let go and remained with the show for quite some time afterwards. Were they terrible dancers? Mr. Carter, or excuse me, Mr. Martina, there's nothing in the record as to their abilities. But Mr. Martina's testimony is very clear that Ms. Carter, from the beginning, did not demonstrate what he was looking for as a choreographer. And, again, it is a subjective judgment call that you're making when you are talking about live theater as opposed to many other cases in which the board is involved. Well, the bigger thing was her attitude, as reflected by the complaints from the fellow dancers and the dance captains, right? Yes, it was certainly, if not bigger, I would say it was at least as big. Again, when you're working in the context of live theater, performers' attitudes and behavior backstage can be very important in terms of how well they're going to perform when they do take the stage. And that was also a consistent complaint that the dance captains had been receiving from other dancers, really, since the time that she joined the show. A tricky aspect of that, for me, was she's constantly talking about the pay and the conditions of work. And then that's what comes up at the December meeting, the pay. It's the holiday pay and things like that, the conditions of work. That does sound like she's then being not renewed for protected activity. And so the complaining seems to blend into the protected activity a bit. How do we, I guess I would ask, how do I distinguish the allegation of complaining from the protected activity, if you understand the question? The allegation of her complaining to her co-workers. Well, she wasn't always just complaining about pay and whatnot. A lot of it, apparently, according to the record, had to do with boyfriends and the costume fitters and things of that nature. So I think the ALJ came to the correct conclusion, again, in looking at everyone's testimony and observing their demeanor. But I know for Mr. Martina, he's very, very clear in his testimony that the negativity, what he kept calling the negative behavior backstage, was impacting other dancers' performances on stage. And so, yes, that obviously was a consideration. But the holiday pay issue that you mentioned at the December meeting was not raised by Carter. It was raised by another dancer, and those who testified that were present at the meeting said that Mr. Saxe's interchange with that second dancer was actually much more heated than his exchanges with Ms. Carter, and yet that dancer was not let go. So I don't think there's anything suspicious about the timing. Her contract was due to expire on January 2nd. Contract renewals, the record makes clear, for all of the dancers were going on in the middle to end of December. This is an industry practice, so there's really nothing suspicious about that. Ms. Carter testified clearly that she understood her contract was not for infinity, that every six months it could be renewed or not renewed, and that that was always in play. And I think the ALJ did specifically address all of those issues. Was there anything in the record that they traditionally waited until the last month or so before they either extended the contract or didn't extend it, the reason being that if you told a dancer six months in advance we're not going to renew your contract? Is there anything in the record about that? I'm sorry, there's no specific testimony, but when you look at the dates on the contracts that are in the record, they do tend to fall in that last couple of weeks before the contract expired. And even Ms. Carter did not testify that she thought it was unusual as of December 13th or 21st, whatever it was, that she didn't seem to find that unusual that her contract had not been renewed. So that specific question wasn't asked, but it does seem to be the industry standard if you just look at the dates on which the contracts were all signed. And Mr. Sachs' email response indicates why you might not want to let these dancers know too soon. I'm sorry. He says, I hope you'll be a professional about this. Yes, he did say that to her, right. And continue to perform through the end of the current contract. Yes, he did ask that she do that, and she did, in fact, perform to the end of her contract term. In terms of the extension of her contract, the contracts were for six months, but the extension was for a longer period. Is there any explanation as to that? There is not. I don't believe that that ever – So in reinstating her, what contract would she have? The final contract that she signed was the one that was due to expire on January 2nd, 2012. That date was specified. So I guess that would be – that may have been the extension. I would have to just double-check on that. But the end date was specifically stated to be January 2nd of 2012. So what would she be reinstated to? The record is silent on that because she – What's your client's understanding of that, of this order? I'm sorry? What is your client – your client is challenging this order. What is your client's understanding of what the order requires it to do as to Mrs. Carter? The board order? It would be – well, to reinstate her employment with the contract terms, which would not include those which were found to be unlawful by the ALJ. Which contract? I would presume – and again, maybe this speaks to further proceedings, I suppose – that it would be – it would track very similarly to her – the last contract that she had. So would that all be a matter to be worked out in the compliance proceedings? Yes. All right. Yes. There are no further questions? So the reinstatement says, full reinstatement to her former job or, if that job no longer exists, to a substantially equivalent position without prejudice to her seniority, which I don't think they have anyway, or any other rights or privileges previously enjoined. And that's precisely why I asked the question. Right, yes. I don't think seniority would become an issue. The six-month contracts do remain the industry standard and are used, so I presume that that's what it would be. All right. Thank you. Thank you. Mrs. Isbell? May it please the Court, Kelly Isbell here on behalf of the National Labor Relations Board. David Sachs knew for 18 months that his choreographer did not want to renew Ann Carter's contract. It was not until after she engaged in protected concerted activity by leading an employee meeting at which she raised issues regarding pay and scheduling and injuries that he decided it was finally time to let her contract expire. So one of Martina's testimony that the Las Vegas Explanation Show had reached a point where it was in good shape and they were getting inquiries about taking the show on the road and it was a successful operation. Mrs. Carter hadn't changed from day one, but they were receiving all of these applications from very good dancers and so when they were doing the auditions, they were contemplating replacing or not renewing Mrs. Carter. The ALJ focused on all of that. I think the ALJ answered your question, Your Honor, by saying that when they held those auditions in November, there was no evidence, no one ever said that they actually found dancers better than Ann Carter. They were looking for, I think Sachs testified, up to four dancers to replace his lowest four. There's no evidence they found those four dancers. And if they had, then they could have fired her then. The contract allowed for a two-week notice and non-renewal. So if they had found dancers better than Ann Carter in November, they could have at least put that in the record, told the board about it, or let her go. Well, firing is harsher than not renewing. Not renewing. You're using not renewing there? Well, if in November, before the December protected concerted activity, they could have not renewed. Well, they could have let her go. They could have given her notice and let her go. So I have a question about the board's order, the board's opinion. It makes the point similar to the point you started with, I believe, which was Sachs had renewed her before, even after receiving complaints about her. But it just strikes me that that can't be the dispositive, because there's the concept of a tipping point, which is, okay, I'm going to give a second chance. I'm going to give a third chance. This is every employer in the country probably goes through this on a regular basis with, I want someone to improve, I want to help them, and then it's not happening. And finally, you reach the point of, in this case, not renewing. The board didn't seem, one of my questions about the board's opinion, it didn't seem to acknowledge that part of the AOJ's reasoning and just the real-world reality of how these things can happen. I think on this record, you started talking about it a little bit before, there are two parts to Rightline, right? There's no dispute that the protected concerted activity was a motivating factor in her discharge. Then we move to the second part of Rightline, where Sachs has to explain why he discharged her then. And the board found that his shifting explanations were a pretext. Well, I want to get to the shifting explanations separately, but on this point, which is the paragraph before the shifting explanations point in the board's opinion, the board seems to rule out the possibility that he would have non-renewed her anyway because he had renewed her previously. And that just struck me as a failure of logic there, or unreasoned decision-making, I guess. On this record, I don't find in Sachs's testimony anywhere where he says there was a tipping point. He never explains to the board or the AOJ there was a straw that broke the camel's back. That never comes up. What he says is, they told me they didn't like her. I decided not to renew her contract. But he never explains why then. Why was that the time? Because her contract was about to expire, so he had to make a decision. So you're presented wanting to avoid the decision, but he had to make the decision that it was coming up in early January. Martina testified that they were holding auditions. He wanted to replace her. The discussions about replacing her never occurred until after the meeting. Kelsey testified and was credited by the AOJ. Discussions about not renewing Carter never came up until after the December 13th meeting. All of the complaints about her had been happening for 18 months. The only thing that... Are you discounting Martina? Martina says, in October, this is Martina. He, Sachs, was starting to see what was happening from my standpoint. And we had very much discussed whether we were going to give her notice or whether we were going to let the contract ride out. And it was decided to let the contract ride out. And did Mr. Sachs agree to that decision? He did. That was in October when they were doing these... when they were trying to decide who they were going to replace. What the AOJ says about that testimony is that no matter what Martina believed, David Sachs was the decision maker. And that Martina might have believed a decision had been reached then, but no decision was reached until after the protected concerted activity. But the problem in this case, as you're well aware, is that's the same time when you would normally be making the decision, which is December, of non-renewing someone. And so that's the conundrum there. And on the shifting explanations point for Sachs, because that's the next paragraph of the Board's opinion, my concern about that paragraph is the Board seems to say, well, he had conflicting explanations, therefore we're not going to credit him. Whereas the AOJ said he had conflicting explanations, I'm going to credit his first set of testimony. As I read the AOJ, at least. And the problem, as Judge Henderson underscored, is the Board says it's accepting all the AOJ's credibility findings, but it doesn't seem to accept the credibility finding that, at least as I read it, the AOJ accepted Sachs' first round of testimony. Well, his first round of testimony, as I read it, is just that he decided to let her go. Not because of the protected activity. Well, he says that at the end of 2011, I don't know if you've read his testimony, it is not clear. He listened to Martina and the dance captains and decided not to renew her contract. But there is no explanation by Sachs that, he doesn't go any further than that, for example. So what the Board is saying is that the AOJ has made a derivative inference. There's no testimony that says, I decided solely on the, I never considered the protected activity. We documented her bad performance. This was the end. I've given her three chances. That's not the testimony. The AOJ only credits what Sachs said, because everybody else said we started talking about it after the December meeting. The AOJ had made a derivative inference, because... What do you mean by derivative inference in this context? I thought the AOJ just said, I believe, based on all the testimony, that Sachs would have non-renewed her, regardless of what she said at the December meeting. And that's the inference. That's what I mean. There's no direct testimony exactly that way. That's something you have to draw from all the testimony. And the Board... That's what Sachs ultimately says in his first round of testimony. That he... You have to either believe Sachs or not believe Sachs when Sachs says, in essence, I would have non-renewed her, even absent what happened in the December meeting. Either believe him or not on that. And the AOJ ends up believing that, as I understand it, in part because of all the corroboration from Martina and the dance captains and what have you. There's reason to be skeptical of that, I understand, because of the timing and because of his prior behavior. But he says that, and the AOJ believes that, and the Board says we do not challenge the AOJ's credibility findings, yet it seems to, in essence, challenge the AOJ's credibility findings. That's why I think a remand might be in order here. You can roll that into your answer and all that. Okay. You might have to catch me off on this. I don't know if I can hold it all in my head. I think that's where there's a legal finding there. David Sachs says, we decided, we talked about it, Tiger didn't want her anymore. I said, okay, we'll get rid of her. But the legal inference from that that the AOJ drew is he would have fired her anyway. That's a legal conclusion, and the Board disagrees. Because of all the things we've talked about, the timing and the shifting... He would have, he had decided in his own head, or he had said to people, which we don't have that, but he had decided in his own head that he was going to non-renew her, regardless of what had happened at the December meeting. I don't read that as testimony, certainly. And what we know from the facts is that that decision was not made until after the meeting and after the Protective Concerted Activity. I'm with you on that part of it. And the AOJ says that in the part of the testimony of credits. The point then becomes, yeah, the timing is suspicious. He says, well, I would have done it anyway. And the question is, are you lying or are you telling the truth? That's really what it comes down to. Are you lying or are you telling the truth when you say that? And the AOJ has to figure out, are you lying or are you telling the truth? And that's really hard to do. And so that's a tough thing to do in trials every day. And the AOJ does it based on the other testimony and says, I conclude that he was going to non-renew her anyway. And the Board comes in and says we accept credibility, but then it doesn't really accept credibility because it doesn't accept that not lying part. I know I'm way past my time. Let's not forget also that the AOJ did not do part of the right-line analysis. She identified the shifting explanations, and she did not discuss the pre-textual analysis of the Board. Well, she didn't say pre-text, but she was dealing with the second part of right-line. I mean, she cites right-line, and then she deals with the first prong, and then she turns to the second prong. So I agree, she didn't use the word pre-text, but isn't that what she's trying to figure out? I think she does. What the Board is saying is that she never explained the shifting explanations as part of pre-text. So my question is whether or not the error, and let me say, this is Judge Kavanaugh's point, I thought this was a difficult case and therefore went back to reread Universal Camera about our standard of review here because all of our cases keep talking about that, and we have this K decision from this circuit saying that the Board is free to reject these. Credibility determination. So I wondered whether what the Board was concerned about was not that the AOJ didn't understand there were two parts to the right-line analysis, but rather that she didn't understand that it was the employer's burden to demonstrate. And so Sachs, who is the decision-maker, really has to say on the record what are the reasons that he would have fired her even if this December 13 meeting had never occurred. And that's what I thought in that sentence I quoted, and I will not quote again, I thought that's what the Board was getting at. And so the question is, given Universal Camera and our standard of review, why wouldn't we want to send this back to the Board for a further explanation of how it wants to resolve this case? I think you certainly could. I mean, I think the Board's view is, as it stated, that it did not overturn any credibility determinations. That even on this record, I think even if you decide the Board did overturn a credibility determination that Sachs had decided to not renew her contract without, not because of the PCA. But understand, Universal Camera and our CAED decision make it clear that's not a problem, all right, if the Board overturns a credibility determination. That was my next point. All right. So then was the Board really saying, because it's presumed to know our precedent at Universal Camera, that there is a heavy burden under the second prong of Wright-Larratt, and it wasn't satisfied that Sachs had met it? And that's why it's so difficult in this case to figure out what is the rationale. I mean, we're very deferential for all the reasons Universal Camera says, but did the Board give a sufficient explanation? Well, I think you've identified the crux of the Board's decision. It did not think Sachs had made his right line, met his right line burden of showing that he would have fired her in the absence of protected concerted activity. The Board relied on pretext and the shifting explanations and the timing. Once you come up with pretextual explanations, or shifting explanations, and the Board determines their pretext that hide the true motive, you fail. But what if you take Judge Kavanaugh's points here, that the Board seems to reject the notion that, you know, Mr. Sachs's patience had been tried enough and he was ready to move on, and it had nothing to do with the fact that she was, you know, complaining at this December 13th meeting. I think the Board would want to see some sort of proof that that was actually the reason. Some sort of indication. What would it be? His testimony? It could have been his testimony. I don't read his testimony as saying that explicitly. He said several times that they had disciplined her and written her up formally, but he couldn't find those. ALJ drew an adverse inference because he said there was a meeting at which she was talked to, but they didn't call the manager who was still employed, who was actually at that meeting, and ALJ drew an adverse inference. But that meeting never happened. So I think if there was – That's a question, I think, of whether she was aware of it. That's not a question of what his mindset was. Right. But in terms of meeting your right-wing burden, there's the PCA, and then there's the firing. It would help to show his mindset if he had actually made her aware to help you out there. Exactly right. But he could have had a mindset of, boy, she's getting a second chance, a third chance, and he might not have informed her. But in his own mind, he might have thought she needs to improve to get renewed. On the universal camera point, I just wanted to ask one question. Judge Rogers describes the law accurately. There is some law that suggests when you overturn the ALJ, that means that the board's reasoning has to be scrutinized more carefully, and there's more art than science in how that's articulated in the case law. But here what seems to me to be a potential problem, and I'm reiterating what I said before, is that the board did not purport to be overturning a credibility finding when in reality it seems like that's exactly what it was doing. And that might be a reason for a remand to let it clear up what exactly its rationale is in a case like this. I mean, that would certainly be your prerogative. I mean, I think I've probably told you over and over again what the board's view is. All right. Thank you. Thank you. Does opposing counsel have any time left? Opposing counsel does not have any time left. If you want to reply to take a minute, but we've been back and forth over this record a thousand times. We have, Your Honor. I would just simply emphasize to Judge Rogers' point that the ALJ did, in fact, conduct an appropriate pretext analysis under white line. She didn't use the word pretext, but it goes on for pages. She cites white line repeatedly. So she did, in fact, do what she was supposed to do, and we believe reached the correct conclusion. Where do you think is the best place where he said, Saks, I would have non-renewed her even absent the December meeting? He was not asked that question specifically, but the page I cited previously, A572, he was specifically asked, and they're discussing the decision to not renew her after the meeting, so that testimony is in the context of after the December 13 meeting. He's asked, Why did you not renew her? And he explains that it is in reliance on Martina and the dance captains and that really enough was enough. Thank you.
judges: Henderson, Rogers, Kavanaugh